# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00110-CV

**Mary L. Carter, Appellant**

**v.**

**Gwendolyn Glenn, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 169TH JUDICIAL DISTRICT
### NO. 229,626, HONORABLE GORDON G. ADAMS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Mary L. Carter challenges the trial court's final judgment, rendered after a bench trial, granting appellee Gwendolyn Glenn's claim against her for tortious interference with prospective business relations and awarding $26,482.49 in actual damages, plus $17,850.42 in attorney's fees. We reverse the judgment and render a take-nothing judgment in Carter's favor because we conclude, for the reasons stated below, that there is legally insufficient evidence that Carter proximately caused Glenn's injury.

## BACKGROUND

Carter and Glenn entered into a transaction in 2001 to buy the property at issue in this case. The parties disputed in a prior lawsuit (and continued to dispute in this suit) who was intended to be the ultimate owner of the property and whether fraud occurred. The financing for the property purchase was structured in a manner that resulted in Carter borrowing the money from IndyMac

Bank and being the mortgagor on the loan, while Carter and Glenn were both listed as grantees on the general warranty deed with vendor's lien.

When Carter and Glenn began to dispute their rights and duties with regard to the property, Carter filed the prior lawsuit against Glenn. The 2004 judgment from that prior lawsuit reformed the general warranty deed with vendor's lien conveying the property to grant Glenn ownership of the property, subject to the mortgage held by IndyMac in Carter's name and a second equitable lien created by the judgment in favor of Carter. Carter's second lien was inferior to the note and deed of trust in favor of IndyMac.

The judgment stated that Carter would only be able to exercise the second lien if Glenn "should fail to keep and perform all the covenants and obligations of . . . CARTER under the note and deed of trust." The judgment also stated, however, that Glenn "does not assume payment of the debt evidenced by the note described above." In other words, although Glenn did not assume the note, the 2004 judgment made Glenn responsible for paying the note to IndyMac.

In addition, the 2004 judgment ordered Carter to vacate and surrender possession of the property. The judgment also permanently enjoined Carter from coming within 100 feet of, entering, or remaining on the property.

Glenn filed the present suit against Carter in 2008. Glenn alleged that Carter prevented Glenn from entering into a prospective mortgage loan or other business relationship with IndyMac by misrepresenting herself instead of Glenn as the property's owner and by refusing to sign documents or accept mortgage payments from Glenn. Glenn sued IndyMac in the same suit, and the Federal Deposit Insurance Corporation, as IndyMac's receiver, removed the suit to federal court.

2

While the suit was pending in federal court, the property went into foreclosure and was sold at a nonjudicial foreclosure sale. After Glenn's claims against IndyMac were dismissed with prejudice, Glenn's remaining state-law claims against Carter were remanded to state court.

The trial court heard the case in a two-day bench trial. Carter appeared pro se at trial. The trial court found in Glenn's favor on the sole cause of action heard at trial, tortious interference with prospective business relations. The court awarded Glenn $26,482.89 in actual damages, plus $17,850.42 in attorney's fees and expenses, as well as court costs and post-judgment interest. This appeal followed.

## ANALYSIS

Carter, who is pro se, raises three issues on appeal. She contends that (1) Glenn "perjured" herself by filing suit because Glenn knew that the four elements for a tortious-interference claim were not present; (2) Glenn committed "fraud" when she filed suit against Carter; and (3) Glenn's Third Amended Petition was barred by the statute of limitations. Although not all of Carter's arguments are legally material or preserved, they do, in substance, present a challenge to the sufficiency of the evidence supporting the trial court's judgment for Glenn on Glenn's tortious-interference claim. *See* Tex. R. App. P. 38.9.

**Standard of review**

To establish a claim for tortious interference with prospective business relations, Glenn had the burden of proving that: (1) there was a reasonable probability that Glenn would have entered into a business relationship with IndyMac; (2) Carter either acted with a conscious desire to

3

prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) Carter's conduct was independently tortious or unlawful; (4) the interference proximately caused injury to Glenn; and (5) Glenn suffered actual damage or loss as a result. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). Carter contends that the record lacks sufficient evidence to establish any of these elements.

When a bench trial is conducted and the court does not enter findings of fact and conclusions of law to support its ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Sixth RMA Partners, L.P. v. Sibley,* 111 S.W.3d 46, 52 (Tex. 2003); *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex. 2002). The trial court rendered judgment for Glenn on her tortious-interference claim but did not enter specific findings of fact or conclusions of law. Therefore, we review Carter's complaints under the presumption that all findings and conclusions were made in favor of the judgment.

When the appellate record includes the clerk's and reporter's records, these implied findings are not conclusive and may be challenged on the basis of legal and factual insufficiency. *BMC Software Belg.,* 83 S.W.3d at 795. We apply the same standards of review to the trial court's implied findings that we apply when reviewing the legal and factual sufficiency of evidence supporting a jury's verdict. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)).

In a challenge to legal sufficiency, we review the evidence in the light most favorable to the judgment and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could

4

and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* The factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). Therefore, to give proper deference to the factfinder, we assume that it resolved all conflicts of credibility in favor of its verdict, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence if a reasonable juror could have disbelieved it. *See City of Keller*, 168 S.W.3d at 819.

**Evidence of tortious-interference elements**

Although Carter challenges the sufficiency of the evidence supporting all five elements of Glenn's claim for tortious interference with prospective business relations, we need only address proximate cause, as it is dispositive. Glenn argued at trial that the documentary evidence from IndyMac showed that Carter's approval and cooperation were required for Glenn to make financial arrangements to pay off the loan or refinance it and that Carter refused to cooperate. Glenn contended that as a result of Carter's conduct, IndyMac foreclosed on the property. To support her argument, Glenn presented evidence at trial that included customer-service call records and correspondence from IndyMac's document production, as well as Glenn's own testimony about her conversations with IndyMac employees and her efforts to make payments and refinance the loan.

There is some evidence in the record that Carter made statements to IndyMac in the time period between late 2004 and the end of 2005 indicating that she still owned the property or that she was trying to get the property back through litigation even though she had not appealed the

5

judgment.[1]  The critical time period in this case, however, is the period between when IndyMac informed Glenn in March 2006 that it would give her full access to information on the loan and when the loan went into foreclosure in February 2008.

IndyMac corresponded with Glenn in March 2006 and June 2006, and its letters explained IndyMac's perspective on events involving the loan up to that point.  The March letter explained IndyMac's position that it was required by law to maintain the security of its borrower's information, and thus, it had responded to a 2002 request for information by advising Glenn that Carter's written authorization was required before IndyMac could release information to Glenn because Glenn's name was not on the loan.  The letter further noted, however, that in February 2006 IndyMac's home loan servicing division had received a copy of the 2004 judgment and updated its records to consider Glenn "an authorized party granted full access to loan information."

The June 2006 letter provided Glenn with a more detailed explanation of IndyMac's understanding of the effect of the 2004 judgment.  In addition, IndyMac requested that Glenn confirm her Social Security number, various names used (with government identification linking the names), mailing address, and name that IndyMac should use when contacting her and asked that she provide

---

[1] There is also one IndyMac call note dated March 6, 2006, from which competing inferences could be drawn.  The note indicates that "bwr [borrower]" called in to inform she would make one or two payments in March and two payments in April, but it also says "put pymnt [payment] freeze."  Glenn used this statement to impeach Carter after Carter denied ever telling IndyMac not to accept payments made by someone other than Carter.  The note, however, does not indicate whether the payment freeze was put on at Carter's direction or per IndyMac policy for a delinquent loan, an equal but opposite possible inference. *See City of Keller v. Wilson*, 168 S.W.3d 802, 813-14 (Tex. 2005) ("'When the circumstances are equally consistent with either of two facts, neither fact may be inferred.'").  IndyMac's March 21, 2006 letter to Glenn indicated that at the time of the March 6 call both the February and March payments were past due.

a letter stating that she wished to be added to the loan records, so that she would receive all correspondence on the loan and the interest and credit reporting for the loan would be in her name. Glenn testified that she had provided IndyMac with this information. The letter also informed Glenn that IndyMac was corresponding with Carter to inform her about what IndyMac was doing with Glenn and also to inform Carter that she needed to keep IndyMac updated on her current mailing address because if the loan became delinquent, IndyMac would inform Carter of any default notices issued.

Although Glenn testified that there were times when IndyMac refused to cash checks that she mailed in or when she could not get through to IndyMac customer service to make payments because the access code on the account had been changed, she provided no specific dates for when this happened. Based on this testimony alone, a factfinder would have to guess whether this happened after IndyMac gave Glenn full access to information about the loan. *See id.* at 813 (explaining that evidence does not rise above a scintilla and is thus legally insufficient if factfinder would have to guess whether vital fact exists). Moreover, we must consider the context of all the call notes that were admitted into evidence. *See id.* at 811-12 (noting that lack of evidence supporting vital fact may only appear when all evidence is reviewed in context). The only time that there are entries in the call notes reflecting that a third party called in and was not allowed information because the party did not know the password is between 2002 and 2005.

Glenn similarly argued that she tried to obtain her own financing for the property, but IndyMac insisted that it could not participate in any transaction without Carter's permission. Glenn contended that Carter refused to give her permission. Glenn testified that she obtained a loan through Ameriquest, but IndyMac told her that Carter was threatening to sue IndyMac if it did not find a way

7

to work with Glenn without revealing Carter's personal information and that it needed Carter's approval to release the property. Again, Glenn offered no testimony about the timing of her effort to obtain her own financing. The only reference to Ameriquest in the call notes is a February 2006 entry: "Auth to release info to Ameriquest Mortgage." Even if we view this evidence in the light most favorable to the verdict, there is no evidence in the record showing that Carter refused to give her permission to any proposed transaction after IndyMac corresponded with Glenn in March 2006 and June 2006, nor is there evidence of the effect the Ameriquest loan would have had on Glenn's ability to make timely payments.

Glenn questioned Carter about only one time-specific event that occurred after the June 2006 letter—a January 2, 2007 call. Glenn focused on the portion of the call note that states "cust would like to review the situation with the borrower/co-borrower" and the next line that states "uncooperative," noting her belief that "co-borrower" referred to Glenn. Glenn asked if Carter knew why IndyMac would write this, and Carter responded that she never tried to contact Glenn because of the restraining order. Even when viewed in the light most favorable to the judgment, a factfinder would have to guess what this statement means. Moreover, there was no testimony or other evidence presented to indicate that this telephone call resulted in IndyMac's refusing to accept any payment from Glenn or that it had an effect on any attempt by Glenn to refinance.

According to the call notes, the loan went into active foreclosure on November 30, 2007. On January 2, 2008, Carter updated her address information with IndyMac. On February 1, 2008, Glenn's mailing address was changed at the direction of the corporate compliance officer who had sent Glenn the June 2006 letter and whom the notes indicate Glenn had been dealing with. The notes further indicate a repayment plan was being sent to the corporate compliance officer and that

8

on February 7, 2008, a "w/o [workout] pack snt [was sent] via o/n [overnight] ml [mail]" and with a return overnight mail envelope included. The letter from IndyMac containing the repayment plan stated that IndyMac had to receive a signed and dated copy from Glenn by February 15, 2008. Glenn testified that she never signed the repayment plan because she received it the day that the first payment was due.

After Glenn received notice of the foreclosure, she filed for bankruptcy on February 13, 2008, to try to stop the foreclosure.[2] Glenn testified that she could not afford to bring the note current at the time of the foreclosure. Glenn further testified, "I had a short sale person to the side. I had a broker to the side. I had a buyer to the side," but that when it came down to getting a seller's agreement from Carter "saying she's willing to cash out on herself," Carter refused to answer any questions because of the restraining order.

The call notes reflect otherwise, however. On February 11, 2008, the notes state:

> Trying to get ahold of brw [borrower] to see if she will allow me to release ph# to Ms. Gwen Glenn. We r trying to wrk something out but brw must sign off on any doc tht needs to be signed.

Then later that day:

> Cld cell ph# & spk w/brw. Askd if she wld allow me to give this 3rd party her ph# to contact. She std no. 3rd party has a restraining order against her & she is nt allowed to be in contact w/brw by law so no will nt allow me to gv any info to this 3rd party. **Askd if Indy ws in the middle & were to set up some type of arr [arrangement] wld she sign. She std yes.** Askd if we were to apprv fr some type

---

[2] The IndyMac debt was never adjudicated by the bankruptcy court, and none of Glenn's debts were discharged either. The bankruptcy case was concluded on March 11, 2008.

9

of arr wld hv to use her income. Askd if she wld provide. She std yes as long as dnt release any of tht info to brw. Advsd we wld nvr release any info to 3rd party w/o auth. Advsd I wld relay info & be in contact if needed.

(Emphasis added.) We cannot disregard this contrary evidence that conclusively establishes the opposite of the vital fact to which Glenn testified: Carter's purported refusal to sign off on any agreement. *See id.* at 814-15.

In sum, Glenn failed to establish any act by Carter after IndyMac had granted Glenn full access to the loan information that prevented Glenn from making payments or refinancing the loan. In addition, there is testimony from Glenn that she could not afford to bring the note current at the time of the foreclosure, and the call notes reflect that Carter told IndyMac she was willing to sign off on any arrangement made by IndyMac with Glenn as long as IndyMac kept Carter's financial information confidential. Crediting all favorable evidence that a reasonable factfinder could believe and disregarding all contrary evidence except that which it could not ignore, we hold that there was no evidence that Carter's conduct was the proximate cause of the foreclosure. *See id.* at 827. We sustain Carter's challenge to the legal sufficiency of the evidence.[3]

**CONCLUSION**

Having concluded that the evidence supporting Glenn's tortious-interference claim is legally insufficient to support the verdict, we reverse the judgment and render a take-nothing judgment in Carter's favor.

---

[3] Having found in Carter's favor on this issue, we need not reach her third issue asserting that Glenn's Third Amended Petition was barred by the statute of limitations. *See* Tex. R. App. P. 47.1.

_____

Scott K. Field, Justice

Before Chief Justice Jones, Justices Pemberton and Field

Reversed and Rendered

Filed:   December 31, 2014

11